**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| **JESSICA J. JELINEK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 3:19-cv-00379-DRL-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Andrew M. Saul,* | ) | |
| *Commissioner of Social Security,*[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Jessica J. Jelinek, who had previously been determined to be disabled, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") finding her to no longer be disabled, and denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF 1). The appeal was referred to the undersigned Magistrate Judge on December 30, 2019, by District Judge Damon R. Leichty pursuant to 28 U.S.C. § 636(b)(1)(b), Federal Rule of Civil Procedure 72(b), and this Court's General Order 2019-19 for the issuance of a Report and Recommendation. (ECF 18).

Having reviewed the record and the parties' arguments, I FIND that two of Jelinek's arguments warrant a remand of the Commissioner's final decision, and accordingly, RECOMMEND that the Commissioner's decision be REVERSED and the case REMANDED

---

[1] Andrew M. Saul is now the Commissioner of Social Security, *see, e.g.*, *Saunders v. Saul*, 777 F. App'x 821 (7th Cir. 2019); *Michael T. v. Saul*, No. 19 CV 1519, 2019 WL 3302215, at *1 n.2 (N.D. Ill. July 23, 2019), and thus, he is automatically substituted for Nancy A. Berryhill in this case, *see* Fed. R. Civ. P. 25(d).

for further proceedings.  This Report and Recommendation is based on the following facts and principles of law.

## I.  FACTUAL AND PROCEDURAL HISTORY

Jelinek was previously found to have been disabled and entitled to DIB and SSI as of November 30, 2009.  (ECF 9 Administrative Record ("AR") 39, 121, 127).  On review, the state agency found that Jelinek was no longer disabled, and could engage in substantial gainful activity ("SGA") as of February 9, 2015.  (AR 39, 127).  "The Commissioner bears the burden in a continuing disability case of showing that the claimant has experienced medical improvement such that she can engage in SGA."  *Hickey v. Colvin,* No. 13 C 7857, 2015 WL 3929642, at *2 (N.D. Ill. June 25, 2015) (listing cases).

The state agency's decision was upheld on reconsideration after a hearing before a state agency Disability Hearing Officer.  (AR 143, 156-57, 167).  After a timely request (AR 172-73), a hearing was held on May 1, 2018, before administrative law judge ("ALJ") Daniel Dadabo, at which Jelinek, who had waived representation, two medical experts ("ME"), and a vocational expert ("VE") testified.  (AR 60-99).[2]  On July 12, 2018, the ALJ rendered an unfavorable decision to Jelinek, concluding that she was not disabled despite her impairments, and that she has been able to perform a significant number of jobs in the national economy since February 9, 2015.  (AR 36-59).  Jelinek's request for review was denied by the Appeals Council (AR 1-3), at which point the ALJ's decision became the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.981, 416.1481.

---

[2]  Jelinek had an earlier telephonic hearing on June 26, 2017, during which the ALJ asked her to send updated medical records and advised her on how to secure representation.  (AR 100-17).

Jelinek filed a complaint with this Court on May 15, 2019, seeking relief from the Commissioner's decision. (ECF 1). In her appeal, Jelinek alleges that the ALJ: (1) erred in assessing her mental residual functional capacity ("RFC"); (2) erred in assessing her physical RFC; (3) erred in weighing medical opinion evidence; and (4) improperly assessed her subjective allegations addressing the intensity, persistence, and limiting effects of her pain and symptoms. (ECF 15).

At the time of the ALJ's decision, Jelinek was 30 years old (AR 50, 65, 119); had acquired a GED (AR 50, 65) and possibly an associate degree (AR 147, 159);[3] but had no relevant work experience (AR 50). Jelinek was initially found to be disabled due to an affective disorder and a discogenic disorder. (AR 47, 128). In her request for a hearing, Jelinek alleges she continues to be disabled due to "schizophrenia, bi polar [sic], paranoia, delusion, major depression, PTSD, anger problems and chronic pain . . . ." (AR 173).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the [ALJ] applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863,

---

[3] There is an ambiguity in the record, as Jelinek testified before the ALJ that the furthest she had gone in school is obtaining a GED. (AR 65).

869 (7th Cir. 2000) (citation omitted).  "Substantial evidence must be more than a scintilla but may be less than a preponderance."  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."  *Clifford,* 227 F.3d at 869 (citations omitted).  "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive."  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III.  ANALYSIS

#### A.  *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3), 1382c(a)(3)(D).  However, a claimant's "continued entitlement to such benefits must be reviewed periodically."  20 C.F.R. §§ 404.1594(a), 416.994(b).  Benefits may be discontinued if a claimant experiences a medical improvement related to her ability to work.  *Id.*  A "[m]edical improvement is any decrease in the

medical severity of your impairment(s) which was present at the time of the most recent

favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. §§

404.1594(b)(1), 416.994(b)(1)(i).

When determining whether a claimant who has previously been found to be disabled has

experienced medical improvement, the Commissioner is to consider whether the claimant:

> (1) is engaging in [SGA];
> (2) has an impairment or combination of impairments that meet or
> equal the severity of a listed impairment;
> (3) has experienced medical improvement, as that term is defined
> in the regulations;
> (4) has experienced an increase in [her RFC] as a result of the
> improvement;
> (5) has, if no improvement exists, the ability to engage in [SGA];
> (6) has current impairments that are severe in combination despite
> medical improvement;
> (7) has the ability and RFC to do [her] past relevant work; and
> (8) has the ability to do other work that constitutes SGA.

*Hickey*, 2015 WL 3929642, at *2;[4] *see also* 20 C.F.R. §§ 404.1594, 416.994. "The

Commissioner bears the burden in a continuing disability case of showing that the claimant has

experienced medical improvement such that [she] can engage in SGA." *Hickey*, 2015 WL

3929642, at *2 (citations omitted). However, "[t]o prevent termination of benefits under the

Social Security Act, the claimant bears the burden of showing by medical evidence that he/she is

disabled." *Mables v. Sullivan*, 812 F. Supp. 886, 888 (C.D. Ill. 1993) (collecting cases).

### B. The Commissioner's Final Decision

On July 12, 2018, the ALJ issued a decision that ultimately became the Commissioner's

final decision. (AR 39-52). At step one, the ALJ concluded that Jelinek had not engaged in

---

[4] Step one is omitted if a claimant is only seeking review of an SSI claim pursuant to Title XVI of the Act. *See Eaton v. Astrue*, No. 1:11-CV-1688-WTL-MJD, 2012 WL 6201115, at *1 (S.D. Ind. Dec. 12, 2012) ("For the Title XVI claim, the performance of SGA is not a factor used to determine if the claimant's disability continues." (citing 20 C.F.R. § 416.994(b)(5))).

SGA as of February 9, 2015. (AR 41). Before proceeding to step 2, the ALJ found that, as of

February 9, 2015, Jelinek had the following severe impairments: "Schizoaffective Disorder,

Attention Deficit Hyperactivity Disorder (ADHD), Anxiety Disorder, Bi-Polar Disorder,

Borderline Personality Disorder, C5-T7 compression deformities and degenerative changes, L5-

S1 degenerative changes with extrusion causing foraminal narrowing and stenosis, and morbid

obesity with status post bariatric surgery, and April 2011 carpal tunnel release." (*Id.*). At step 2,

the ALJ found, since February 9, 2015, Jelinek did not have an impairment or combination of

impairments severe enough to meet or equal a listing. (*Id.*).

At step 3, the ALJ found that a medical improvement had occurred as of February 9,

2015. (AR 47). Proceeding to step 4, the ALJ found that the medical improvement related to

Jelinek's ability to work, and that her impairments no longer met or medically equaled the same

listing that was met as of February 9, 2015. (AR 49). Because the ALJ found that a medical

improvement occurred, he did not make a step 5 finding. Turning to step 6, the ALJ determined

that Jelinek's impairments were still "severe," causing "more than a minimal limitation in [her]

ability to perform basic work activities." (*Id.*). Before reaching step 7, the ALJ assigned Jelinek

the following RFC:

> Beginning on February 9, 2015, based on the current impairments,
> the claimant has had the RFC to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b), subject to only occasionally
> stoop, crouch, crawl, kneel and balance, only occasional ramps and
> stairs, no ladders, ropes or scaffolds, no unprotected heights, heavy
> equipment, operating machinery or hazards, and only frequent
> reaching, handling and fingering.
>
> She is able to understand, remember and apply simple information.
> She is able to adjust to routine changes in process and priority. She
> needs work that is rote and of limited variability. She should avoid
> frequent communication, public contact or more than occasional
> interaction with co-workers and supervisors. She is able to work

> five days a week, eight hours a day at a consistent pace with only
> normal breaks.

(*Id.*).

At step 7, the ALJ determined that Jelinek had no past relevant work.  (AR 50).

Nevertheless, at step 8, the ALJ found that "[b]eginning on February 9, 2015, considering

[Jelinek's] age, education, work experience, and RFC . . . based on [her] current impairments,

[Jelinek] has been able to perform a significant number of jobs in the national economy"

including sorter, hotel housekeeper, and small parts assembler.  (AR 50-51).  Accordingly, the

ALJ affirmed the state agency's determination that Jelinek's disability had ended.  (AR 51).

*C.  Mental RFC*

1.  Concentration, Persistence, or Pace

Jelinek first contends that the ALJ erred by failing to include "moderate restrictions in

concentration persistence or pace in his assessment of [her] RFC" and by finding that she "could

understand, remember, and apply simple information, that she could perform work that was rote

and of limited variability, and that she could adjust to routine changes in process and priority."

(ECF 15 at 8 (citing AR 42, 49)).  She also contends that ALJ failed to provide evidence to

support his conclusion that she "retained the mental RFC to perform work that required simple

and routine information and that involved rote . . . and invariable tasks in an environment where

she needed to avoid frequent communication, public contact, or more than occasional interaction

with coworkers and supervisors."  (*Id.* at 11 (citing AR 49)).  In response, the Commissioner

asserts that while the ALJ did not specifically use the language "concentration, persistence, or

pace" in his RFC formulation, he properly accounted for any such limitations using alternate

phrasing.  (ECF 16 at 7-8).

The ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). Relevant to this appeal, the "paragraph B" criteria consist of four broad functional areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see, e.g.*, *Johnnie M. v. Berryhill*, No. 2:18-cv-00066-MJD-JMS, 2019 WL 521176, at *3 (S.D. Ind. Feb. 11, 2019); *Brynelson v. Berryhill*, 329 F. Supp. 3d 629, 638 n.6 (N.D. Ill. 2018).  "[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) . . . ."  SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment . . . requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ."  *Id.*; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). That is, the RFC is an assessment of "what an individual can still do despite his or her limitations," SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1), and "must be based on *all* of the relevant evidence in the case record," SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).  Ultimately, though, "the RFC determination is one firmly within the ALJ's discretion to determine, so long as [he] sufficiently articulates his reasoning and the record adequately supports his conclusion."  *Terry*

*v. Astrue*, No. 3:09-CV-503 JD, 2011 WL 855346, at *17 (N.D. Ind. Mar. 7, 2011) (collecting cases).

Here, the ALJ, determined that '[w]ith no more than moderate functional limitations, [Jelinek] does not satisfy the 'B' criteria. Nor does she satisfy the 'C' criteria . . . ." (AR 49). In doing so, the ALJ relied upon and gave "substantial weight" to the opinion of Michael Carney, Ph.D., a non-examining medical expert who testified at the hearing. (AR 42; *see also* AR 89, 1164). In assigning Jelinek an RFC, the ALJ specifically referred to his earlier analysis of the medical evidence without additional evaluation. (AR 50 ("As for the opinion evidence, see discussion under Finding 5 *supra*.")). Nevertheless, the ALJ assigned Jelinek the following mental RFC:

> She is able to understand, remember and apply simple information. She is able to adjust to routine changes in process and priority. She needs work that is rote and of limited variability. She should avoid frequent communication, public contact or more than occasional interaction with co-workers and supervisors. She is able to work five days a week, eight hours a day at a consistent pace with only normal breaks.

(AR 49). At the hearing, the ALJ asked the VE a hypothetical containing these same restrictions. (ECF 95).

The undersigned cannot say that the ALJ properly "translated" Jelinek's "no more than moderate" limitations in concentration, persistence, and pace. As the Seventh Circuit Court of Appeals has held, "[t]he ALJ must explicitly account for all a claimant's limitations in [his] hypothetical, including limitations in concentration, persistence, or pace, unless the vocational expert has independently reviewed the medical record." *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *Lanigan v. Berryhill*, 865 F.3d 558, 563, 565 (7th Cir. 2017)). There is no "per se requirement that this

specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  Nevertheless, "for most cases, the ALJ should refer expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.

When the Seventh Circuit has upheld an ALJ's hypothetical and RFC with alternative phrasing, "it was manifest that [such] alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.* at 619 (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a hypothetical restricting the claimant to work involving low production standards and a low-stress environment, where the claimant's difficulties with concentration, persistence, or pace arose from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress" work to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from a panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of stress" adequately accommodated the claimant's concentration problems arising, in part, from a panic disorder)).

The limitation to work that is "rote and of limited variability" used here is insufficient. While not exactly the same terminology, courts have consistently held that limiting a claimant to "simple, routine, and repetitive tasks" does not properly account for moderate limitations in concentration, persistence, or pace.  *See, e.g., Kelly v. Saul*, No. 1:19-CV-033-PPS, 2020 WL 290080, at *1-2 (N.D. Ind. Jan. 21, 2020).  It is hard to see how work that is rote—meaning

10

learned by "use of memory usually with little intelligence" or "mechanical or unthinking routine

or repetition"—has any meaningful difference from work that is "simple, routine, or repetitive."

*Rote*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/rote (last visited

June 22, 2020). Still more, "[b]ecause response to the demands of work is highly individualized,

the skill level of a position is not necessarily related to the difficulty an individual will have in

meeting the demands of the job." SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985). "A

claimant's [mental] condition may make performance of an unskilled job as difficult as an

objectively more demanding job.'" *Id.*

Similarly, it is unclear how the ALJ accounted for Jelinek's moderate limitations in

concentration, persistence, or pace when he found that she could "perform a job five days a

week, eight hours a day, at a consistent pace with only normal breaks." (AR 49). As one court

in this circuit has observed:

> [T]he Commissioner has in another recent case indicated that
> normal breaks occur every two hours during a regular 8–hour
> workday. *Braithwaite v. Commissioner of Social Security*, 2011
> WL 1253395, at *5 n. 4 (E.D. Cal. March 31, 2011). . . . It does not
> seem to make sense to conclude, as the ALJ apparently did here,
> that an individual with moderate limitations in the ability to
> maintain attention and concentration would require the same
> frequency of breaks as a typical worker.

*Warren v. Colvin,* No. 12 C 3298, 2013 WL 1196603, at *3 (N.D. Ill. 2013). Still more, the ALJ

does not specifically cite to evidence in the record in support of his decision as to Jelinek's

ability to work at a consistent pace with only normal breaks.[5] *Cf. Lafollette v. Berryhill*, 1:17-

CV-321-PRC, 2018 WL 3805805, at *6 (N.D. Ind. Aug. 10, 2018) ("In her brief, Plaintiff

ignores the ALJ's finding that Plaintiff's time off task can be accommodated by normal breaks,

---

[5] The Commissioner does cite to one instance in which Jelinek allegedly denied a concentration impairment. (ECF
16 at 6 (citing AR 47, 1160). In actuality, Jelinek only denied any recent changes in concentration. (AR 1160).

focusing solely on the language 'simple, routine tasks.'  Moreover, Plaintiff does not address the evidence of record relied on by the ALJ to make that finding.  In fact, Plaintiff does not discuss any record evidence in the context of objecting to the ALJ's mental RFC analysis."); *see also Kelly v. Colvin*, No. 14-CV-624-CJP, 2015 WL 1930035, at *6 (S.D. Ill. Apr. 28, 2015) ("That being said, the RFC assessment is still fatally flawed because there is a complete lack of evidence and analysis supporting the determination that plaintiff could stay focused for two hours at a time.").

Further, the present case is distinguishable from *Johansen* or *Sims*, where such language was found to accommodate moderate limitation caused by panic related impairments.  While there is evidence in the record suggesting that Jelinek suffered from such impairments (*see* AR 851), Dr. Carney testified that he rated Jelinek's concentration, persistence, or pace limitations as moderate due to her "oddities in thinking."  (AR 43; *see also* AR 89-90).  Though the ALJ provided a detailed analysis of Jelinek's record tending to show management and treatment of her symptoms (AR 41-47), he did not explain how limiting her to rote work of a limited variable nature would negate the moderate limitations assigned by Dr. Carney, whose opinion was given "substantial weight."  From the hearing testimony, it is clear that Dr. Carney was aware that Jelinek's symptomology was sporadic but assigned moderate limitations regardless.  (*See* AR 91 ("[C]ertainly there's some oddities and odd thinking that goes on there, but . . . I'm not sure how - - I'm just not convinced at how pervasive it is."); AR 91 ("I mean there's some oddities that come up there and all, but I'm not sure . . . how extensive they are or how well they're sustained.")).  Additionally, as Jelinek points out, she continued to experience such "oddities" even after February 9, 2015—specifically anxiety, blunted affect, and impaired judgement and

thought processes.  (ECF 15 at 10, 12 (citing AR 880, 889, 935-36, 1120, 1123-24, 1128-29, 1132, 1134, 1138)).

It is possible that the VE could have heard Dr. Carney's testimony and incorporated it into her answers to the ALJ's hypotheticals.  *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) ("The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations.  An exception therefore exists for cases in which the vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them.").  "However, the exception does not apply if the record indicates that the VE's testimony was confined to the limitations set forth in the ALJ's hypothetical question."  *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (citing *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)).  Here, though, "[i]n none of [her] responses did the VE rely on or even mention [her] review of the record or [Dr. Carney's] testimony."  *Id.*; (*see* AR 94-96).  Thus, "[I] cannot assume that the VE based [her] testimony on anything but [the] hypotheticals."  *Simila*, 573 F.3d at 521.

In summary, it is not clear whether Jelinek's moderate limitations in concentration, persistence, or pace were adequately represented in the ALJ's hypothetical to the VE and RFC formulation.  Accordingly, I do not believe the ALJ built an "accurate and logical bridge" between the evidence and his conclusion.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  As such, remand is necessary.

2.  Social Interactions

Jelinek also challenges the ALJ's RFC formulation that "[s]he should avoid frequent communication, public contact or more than occasional interaction with coworkers and

supervisors."  (ECF 15 at 11 (citing AR 49)).  In particular, she contends that the ALJ failed to

support his conclusion with substantial evidence, specifically given her self-reports that she was

often irritable and aggressive.  (ECG 15 at 11-12).  This second argument, however, is

unpersuasive.

Contrary to Jelinek's claims, the ALJ did point to evidence in the record in support of his

conclusion.  Again, the ALJ appears to have relied on the testimony of Dr. Carney who noted

that Jelinek "exhibited some paranoid thinking, although there were many references after

[February 9, 2015] to [her] as a pleasant person and her own self-description of herself as 'a

people person.'"  (AR 42; *see also* AR 89).  The ALJ also noted that since February 15, 2009,

Jelinek was within "virtually normal limits on most mental status examination with a few

oddities in thought."  (AR 42).  The ALJ then detailed multiple instances in the record supporting

this conclusion.  (*See* AR 45-47 (citing AR 637 (Jelinek's bariatric surgeon describing her as

"delightful, but unfortunate"); AR 745-47 (June 2, 2014, treatment note from Linda Munson,

D.O., stating that Jelinek made good eye contact, was cooperative, calm, alert, oriented, and

though her mood was liable, she was not delusional); AR 747 (treatment notes from Dr. Munson

showing a GAF score of 66[6]); AR 855 (Jelinek self-reporting herself as "a people person"); AR

857 (Jelinek's counselor, Michele Schricker, noting only moderate distress on April 1, 2015);

AR 882 (Dr. Munson's treatment notes recording a GAF score of 70 in June 2015, suggesting

---

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*  And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well."  *Id.*

Jelinek's mental status was only mildly impacted); AR 923 (treatment notes from Terry Mays, MS, reflecting a mild distress level and flat affect); AR 1150 (April 13, 2016, treatment notes from Michael H. Simpson, M.D, documenting that Jelinek stated "her depression has been relatively well controlled [and that she denied] any recent changes in her irritability, concentration, sleep, libido or mood"); AR 1160 (March 28, 2017, treatment notes reflecting the same)). Still more, the ALJ considered that Jelinek regularly engaged in activities with friends and family. (AR 46 (citing 854-55)).

Jelinek contends that there is also evidence in the record showing that she manifested anxiety, and admitted that she was often irritable, moody, or aggressive. (ECF 15 at 12 (citing AR 880, 889, 935-36, 1120, 1123-24, 1128-29, 1134, 1138)). She also points to her hearing testimony before the ALJ where she again reported feeling aggressive and agitated. (ECF 15 at 12 (citing 80)). That being said, though, Jelinek offers no medical opinion stating that an increased restriction due to her social limitations was necessary. Further, the ALJ was not required to take Jelinek's self-reported symptoms at face value, particularly when they conflicted with other evidence in the record. *See Ziegler v. Astrue*, 576 F. Supp. 2d 982, 998 (W.D. Wis. 2008), *aff'd*, 336 F. App'x 563 (7th Cir. 2009) (" It is well settled that an administrative law judge may disregard a medical opinion premised on the claimant's self-reported symptoms if the administrative law judge has reason to doubt the claimant's credibility." (collecting cases)); *see also Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) ("The portion of Dr. Cascino's report concerning Mr. Diaz's limited ability to sit, stand or walk appears to be based upon Mr. Diaz's own statements about his functional restrictions at the time of the examination. The ALJ could consider this portion of the report less significant than the doctor's other findings, and we shall

not reweigh the evidence on appeal." (citation omitted)).  As such, Jelinek has not met her burden as to the need for additional social limitations.

Jelinek also contends that the ALJ erred by asking the VE a hypothetical about the effect disagreement and aggression would have on a hypothetical individual's ability to maintain employment without including a related functional restriction in his RFC formulation.  (ECF 15 at 12).  At the hearing, the ALJ asked "What's the threshold as far as aggression or disagreement?" to which the VE replied "Well physical aggression is not tolerated at all, so once and you're out, and any type of verbal aggression would be, generally, a couple [of] warnings, but then you're out."  (AR 96).  In support of her argument, Jelinek cites *Potrebic v. Berryhill*, No. 2:17-cv-00462-JVB-APR, 2019 WL 1397477, at *2 (N.D. Ind. 2019); *Morton v. Berryhill*, No. 16 C 11137, 2018 WL 264200, at *6 (N.D. Ill. 2018); *Heuschmidt v. Colvin*, No. 14 C 4377, 2015 WL 7710368, *9 (N.D. Ill. 2015); and *Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850, at *9 (N.D. Ill. 2001).

Jelinek's reliance on these cases, though, is misplaced.  In *Potrebic*, for example, the ALJ included a limitation "that superficial contact with supervisors precluded all work, yet the ALJ included the limitation in the RFC and still found Plaintiff could perform work."  2019 WL 1397477, at *2.  Similarly, in *Morton* the Court considered the VE's testimony "that there would be no competitive employment available for an individual with Plaintiff's RFC who 'required re-demonstration of work tasks up to twice daily after the initial learning period' or 'occasionally required redirection back to task because they're falling off task.'"  2018 WL 264200, at *6 (citing *Sayles*, 2001 WL 1568850, at *9).  Here, though, the VE testified only that physical aggression, or multiple instances of verbal disagreement, would be preclusive of employment. While Jelinek, as discussed *supra* and in greater detail *infra*, testified that she was often

aggressive and irritated, the ALJ was not required to take these claims at face value. Again, "the claimant bears the burden of showing by medical evidence that he/she is disabled." *Mables*, 812 F. Supp. at 888.

Accordingly, I find the ALJ's questions to the VE and RFC formulation, at least as to Jelinek's social limitations, do not, on their own, require remand. That being said, because this matter should be remanded for further proceedings on other grounds, the ALJ should upon remand more fully develop his analysis as to Jelinek's social limitations.

*D. Physical RFC*

1. Evidentiary Deficit

Jelinek next argues that the ALJ failed to "identify evidence that supported the specific functional restrictions that he included in his assessment of [her] RFC." (ECF 15 at 13). More specifically, she contends that the ALJ faced an evidentiary deficit when he concluded that none of the medical opinion evidence reflected her limitations. (*Id.* at 14). Accordingly, she maintains that the ALJ improperly submitted his own lay opinion in crafting the physical RFC. (*Id.*). As mentioned, the ALJ assigned Jelinek the following physical RFC:

> Beginning on February 9, 2015, based on the current impairments, the claimant has had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to only occasionally stoop, crouch, crawl, kneel and balance, only occasional ramps and stairs, no ladders, ropes or scaffolds, no unprotected heights, heavy equipment, operating machinery or hazards, and only frequent reaching, handling and fingering.

(AR 49).

In formulating the physical RFC, the ALJ had three sets of medical opinions to consider—the non-treating state agency doctors who reviewed Jelinek's initial application and later rejection, the ME's testimony at the hearing, and a letter offered by one of Jelinek's doctors.

17

On December 29, 2010, the state agency doctor who reviewed Jelinek's initial application for benefits, D. Neil, M.D., opined that she could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for a total of six hours in an eight hour workday; sit for a total of six hours in an eight hour workday; and was unlimited in her ability to push and/or pull. (AR 542). Dr. Neil noted that Jelinek could frequently climb ramps and stairs, balance, stoop, knee, crouch, and crawl; but could only occasionally climb ladders, ropes, and scaffolds. (AR 543). He noted no manipulative limitations. (AR 544). On review on June 27, 2015, the state agency doctor, M. Ruiz, M.D., opined that "[c]urrent records regarding physical conditions note no severe conditions or limitations." (AR 904).

At the hearing, Robert Sklaroff, M.D., another medical expert, reviewed the record and testified that Jelinek's impairments were primarily mental rather than physical. (AR 42; *see* AR 88). He went on to opine that:

> [In t]erms of RFC, [Jelinek] should be able to stand, sit, or walk, any of them, up to six hours during normal - - eight hour day[s] with normal breaks. No problems with push, pull, squat, bend, reach, other postural changes. No problem lifting 50 pounds occasionally, 25 pounds frequently. No problem with the eyes, ears, special senses (phonetic), hands, feet. In light of psych issues, no heights, ropes, scaffolds, ladders, or hazardous machinery.

(AR 83). The ALJ, however, only afforded Dr. Sklaroff's opinion "some weight" as he considered it "more reasonable to consider [Jelinek's] extreme obesity in combination with [her] documented impairments and treatment course." (AR 42).

Finally, there was a treating source opinion offered by Jelinek's internist, Alexander Gatzimos, M.D., on August 14, 2015, stating:

> My Patient, Jessica Jelinek, is unable to work at this time due to secondary back pain. Due to the back pain she is on a high dose of opiates. Our plan is to reevaluate Jessica when her weight

> decreases to 180 pounds.  Once she has reache[d] 180 pounds we
> will then discuss a new plan of treatment and go from there.

(AR 920).  Dr. Sklaroff, after reviewing the record, though, determined that "there is no evidence

that she has anything specific . . . that would justify the use of narcotics."  (AR 82).  The ALJ

ultimately afforded Dr. Gatzimos's opinion "minimal weight" noting that he was not specialist,

his letter was generalized and did not address specific elements of her impairments and work-

related limitations, his opinion was not supported by objective or treatment evidence, and was

written prior to much of her eventual weight loss and treatment.  (AR 43); *see also* 20 CFR §§

404.1527, 416.927.  The ALJ also correctly noted that the decision of whether a claimant is

disabled is reserved to the ALJ.  (*Id.*).

　　Jelinek does not challenge the ALJ's weighing of Dr. Gatzimos's statement, though, as

seen *infra*, she does challenge the weight assigned to other sources.  Rather, she claims that by

only affording some weight to Dr. Sklaroff's opinion, the ALJ impermissibly provided his own

medical interpretation.  In support of her argument, she provides a laundry list of MRI findings

and treatment notes (*see* ECF 15 at 14-15 (citing AR 458, 459, 922, 957, 962, 978)) and contends

that the "ALJ failed to explain how, given this evidence, he determined" the RFC (ECF 15 at

15).  Jelinek's argument is unpersuasive at least in part.  Much of the evidence that Jelinek cites

was in the record during the hearing and reviewed by Dr. Sklaroff (*see* AR 64 (showing the

evidence admitted at the time of the hearing)), who, as mentioned, assigned a less restrictive

RFC than the ALJ.  The ALJ was entitled to rely upon this opinion in reaching his own

conclusions.  *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  Further, as mentioned,

the RFC determination is ultimately reserved to the ALJ, *Terry*, 2011 WL 855346, at *17, and it

is up to the claimant to provide evidence tending to show greater restrictions are necessary,

*Cunningham v. Colvin*, No. 2:12-CV-85-JMS-WGH, 2013 WL 1026855, at *9 (S.D. Ind. Mar.

14, 2013).  Thus, the ALJ's reliance on Dr. Sklaroff's opinion on its own does not necessitate a remand.

## 2.  New Evidence

While Jelinek's argument that the ALJ's decision contained an evidentiary deficit is unavailing, she also raises a more persuasive argument.  Specifically, she notes that Dr. Sklaroff failed to review the most recent evidence of her thoracic and lumbar spinal impairments.  (ECF 15 at 16).  Indeed, at the hearing, Jelinek informed both the ALJ and Dr. Sklaroff that she believed the record was missing MRI evidence from Vertical Plus MRI (the "Vertical Plus evidence").  (AR 84, 97).  After the hearing, the ALJ appears to have received and reviewed this evidence (*see* AR 59, 1182-86), but it does not appear that the evidence was reviewed by any medical expert offering opinion testimony.  Jelinek contends that the ALJ's failure to subject this "'new and potentially decisive' evidence to 'medical scrutiny'" necessitates remand.  (ECF 15 at 16 (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)).  On this point, I agree.

The Vertical Plus evidence consists of MRI reports from Dr. Thomas A. Predey, M.D., dated July 18, 2016, July 28, 2016, and April 26, 2017.  (AR 1182-85).  As to the July 18, 2016, MRI, Dr. Predey noted (1) levoconvex lumbar scoliosis, (2) at the L5-S1 level, moderate disc degenerative change with a moderately bulky inferiorly protruding posterior midline and left paramedian disc extrusion, causing moderately severe left subarticular recess stenosis and severe left foraminal stenosis, and (3) at L4-5, minimal generalized disc annular bulging and mild right foraminal stenosis.  (AR 1182).  As to the July 28, 2018, MRI, Dr. Predey recorded the following impressions:  (1) multiple chronic healed stable compression fractures in the upper thoracic spine and at C7, and (2) some narrowing of the neural foramina, right slightly greater than left, at the C7-T1 level which appeared to be due to minimal bilateral posterolateral disc bulging, but noted

20

an "[o]therwise stable examination of the cervical spine." (AR 1184). Finally, his impression

following the April 26, 2017, MRI was that there was "redemonstration of multiple compression

deformities in the lower cervical and upper thoracic spine. . . . [and] degenerative change in the

thoracic intervertebral discs and endplates," but "[n]o significant change. (AR 1185). The ALJ

in considering this evidence observed that "[t]hrough June 2015, the non-examining state agency

medical consultants inferred non-severe functional impact from physical impairments . . .

although the July 2016 MRI would imply greater than slight functional work impact . . . ." (AR

46).

While the ALJ cited the 2016 MRI evidence in support of his more restrictive RFC, he

still committed an error necessitating remand.[7]  "ALJs are required to rely on expert opinions

instead of determining the significance of particular medical findings themselves." *Moon v.

Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g*, (Oct. 24, 2014); *see

also McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("An ALJ may not conclude,

without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's

conclusions about her impairments."); *Goins*, 764 F.3d at 680 ("Fatally, the administrative law

judge failed to submit that MRI to medical scrutiny, as she should have done since it was new

and potentially decisive medical evidence." (collecting cases)).  The fact that the ALJ assigned a

more restrictive limitation than the non-examining medical experts is irrelevant as they too had

not reviewed the Vertical Plus evidence.  Ultimately, a medical expert—after reviewing the

Vertical Plus evidence—could opine that even greater postural limitations are necessary.  The

_____

[7] In his findings, the ALJ states that "Clinical findings were sparse, and as medical expert Robert Sklaroff, M.D.,
commented at the instant hearing, there was not a single lumbar image, although the record actually contained a
recently-obtained July 2016 MRI . . . ." (AR 45 (citing to AR 1182)).  Though this might suggest that the Vertical
Plus evidence was part of the record at the time of the hearing, as already discussed, it was not obtained by the ALJ
until after the fact.  (*See* AR 456-57, 1187-88).

ALJ is simply not qualified to interpret that evidence himself. *See Eric H. v. Saul*, No. 18 C

6382, 2020 WL 3100642, at *3 (N.D. Ill. June 11, 2020) ("He acknowledged that the objective

medical evidence was contrary to the various consultants' conclusions that Plaintiff had zero

functional limitations, or that he could work at the medium exertional level with slight additional

postural limitations, but he erred by offering no medical opinion that would support a finding

that Plaintiff could work at the light level."). Accordingly, remand is necessary to medically

consider the Vertical Plus evidence as well.

3.  Aggregate Effects

Jelinek also argues that the ALJ erred in formulating the physical RFC by failing "to

explain how he considered the aggravating effects of Ms. Jelinek's obesity on her other

medically determinable impairments." (ECF 15 at 17). In response, the Commissioner

emphasizes that the ALJ discounted Dr. Sklaroff's testimony because he failed to consider the

aggregate effects of Jelinek's obesity. (ECF 16 at 8; *see* AR 42 ("Although [Dr. Sklaroff]

concluded like the state non-examining physicians that physical impairments caused only slight

or moderate functional impact, the [ALJ] infers that it is more reasonable to consider extreme

obesity in combination with the documented impairments and treatment course.")). Jelinek,

however, contends that this limited mention does not actually "articulate how the ALJ considered

the aggregate effects of [Jelinek's] impairments." (ECF 17 at 8).

"An ALJ must evaluate all relevant evidence when determining an applicant's RFC,

including evidence of impairments that are not severe." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th

Cir. 2012) (citing 20 C.F.R. § 404.1545(a); *Craft*, 539 F.3d at 676). "An ALJ must also analyze

a claimant's impairments in combination" when determining the RFC. *Id.* (citing *Terry v.

Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). "For example, obesity may increase the severity of

coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing."  SSR 02-1P, 2002 WL 34686281, at *5 (Sept. 12, 2002).  While an ALJ "need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett*, 676 F.3d at 592 (citations omitted).  Again, the burden is on the claimant to "specify how [her] obesity further impaired [her] ability to work."  *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

In *Prochaska*, the Seventh Circuit held that an ALJ's failure to explicitly discuss the claimant's obesity in combination with her impairments was harmless error in part because "he specifically predicated his decision upon the opinions of physicians who did discuss her weight," and because the claimant failed "to point to any other evidence suggesting that her obesity exacerbated her physical impairments."  *Id.*  The present case is substantially similar.  While the ALJ's discussion of Jelinek's obesity is scarce, he relied on Dr. Sklaroff, who testified that Jelinek's "obesity as only exogenous, when at one point, she classified out as super obese."  (AR 42; *see* AR 81-82).  Further, the ALJ directly considered Jelinek's weight loss as the result of a gastric bypass surgery on both her mental and physical impairments.  (*See* AR  41 ("Following the bypass, [Jelinek's BMI,] has dropped slowly but consistently, to 42.7 in June 2015 [AR 883], to 41.8 in April 2016 [AR 1143]; to 38.3 in July 2017 [AR 1120], which is no longer defined as morbid obesity."); AR 45 ("By March 2017, her weight was down to 219 pounds and her BMI was only 37.63 [AR 1158], considered level II under SSR 02-1p."); AR 46 ("The claimant indicated her mood was better since her gastric bypass." (citing AR 879)).  In any event, Jelinek only takes issue with the ALJ's supposed failure to explain his reasoning without pointing to any additional evidence which would suggest greater limitations are necessary.  Accordingly, remand

is not necessary on these grounds.  However, because this matter should be remanded on the grounds identified *supra*, the ALJ is to better develop his analysis of the aggregate effect of Jelinek's obesity upon remand.

### D.  Medical Opinion Weight

Jelinek next challenges the weight the ALJ assigned to Dr. Alan Wax, Ph.D., a consulting psychologist who after examining Jelinek in 2011 and administering WAIS-IV testing concluded that she had an IQ of 51, which placed "her at the very bottom of the Mild range of Mental Retardation."  (AR 552).  Dr. Wax also assigned Jelinek a GAF of 45.  (*Id.*).  The ALJ discounted Dr. Wax's opinion, deferring to the opinion of Dr. Carney, who stated at the hearing that the WAIS-IV test was likely invalid as it was inconsistent with Jelinek's academic record and limited experience selling AVON products online.  (AR 44; *see* AR 89).[8]  Jelinek however, claims that the ALJ erred in discounting Dr. Wax's opinion based solely on the opinion of a nonexamining doctor—Dr. Carney—especially considering that the ALJ cited to no clinical finding undermining the opinion.  (ECF 15 at 19-20).  Still more, Jelinek contends that the ALJ failed to explain how her education and AVON experience contradicts Dr. Wax's assessment.  (*Id.* at 21).

Jelinek takes issue with the lack of contrary objective or clinical tests in support of Dr. Carney's opinion (ECF 15 at 21), but the ALJ was not required to look solely to clinical testing, *see Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) ("The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of mental

---

[8] Jelinek also contends that the ALJ mischaracterized the record by stating that Dr. Carney based his opinion on her receipt of an associate degree when Dr. Carney only mentioned her GED.  (ECF 15 at 20; *see* AR 89).  Interestingly, Jelinek does not address the apparent discrepancy between her testimony before the State disability hearing officer that she had obtained a college degree (AR 147) with her testimony before the ALJ that she only received a GED (AR 65).  For the reasons discussed *infra*, Jelinek's argument is unpersuasive, but, because I recommend that this matter be remanded on other grounds, the ALJ should attempt to clarify Jelinek's academic history on remand.

retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation.").  While an ALJ should "generally presume that [a claimant's] obtained IQ score(s) is an accurate reflection of [her] general intellectual functioning[,] . . . contracted medical and psychological experts may conclude that [the] obtained IQ score(s) is not an accurate reflection of [the claimant's] general intellectual functioning."  20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00 (H)(2)(d).  A conclusion that an IQ test is invalid must be based on "relevant evidence in the case record," including data obtained in testing, the claimant's developmental history, information about how the claimant functions on a daily basis in a variety of settings, and "[c]linical observation(s) made during the testing period, such as [the] ability to sustain attention, concentration, and effort . . . ."  *Id.*

Here, as mentioned, Dr. Carney based his opinion that Jelinek's IQ scores were invalid on her daily functioning---specifically, her educational achievements and limited work skills---and he was at least aware of her noted distractibility during the exam.  (AR 89).  Per the Commissioner's own regulations, this is a valid reason to discount an IQ score, and the ALJ was permitted to consider it.  *See Winfield v. Barnhart*, 269 F. Supp. 2d 995, 1007 (N.D. Ill. 2003) (affirming a denial of benefits where the ALJ relied on ME testimony that an IQ test score was, in part, inconsistent with a claimant's "vocational history" and "educational status").  Also, Dr. Carney was able to observe Jelinek's demeanor at the hearing.  (AR 89 ("[H]ow she presents herself today seemed to meet her cognitive function.  Seems to be quite intact."); *see Winfield*, 269 F. Supp. 2d at 1007 ("Dr. Ostrov observed the Claimant at multiple hearings, and unlike the psychologists who examined her, he was privy to the whole record.  This allowed him to contextualize the Claimant's evaluations, and look at them in a more reasoned way than the psychologists who based their findings of mental retardation on the test scores alone.").

Ultimately, "it is the province of the ALJ and not the Courts to resolve conflicts in medical evidence." *Nunez v. Bowen*, No. 88 C 729, 1990 WL 156521, at *2 (N.D. Ill. Oct. 9, 1990) (citing *Struck v. Heckler*, 732 F.2d 1357, 1364 (7th Cir. 1984)). Here, the ALJ accepted Dr. Carney's opinion regarding the validity of Jelinek's IQ test based on a factor identified in the Commissioner's own regulations. The Court will not reweigh the evidence or substitute its judgment for the Commissioner's. *See Clifford*, 227 F.3d at 869. Accordingly, because the Court can properly trace the ALJ's reasoning on review, remand is not necessary with respect to Dr. Wax's opinion. *Id.* at 874.

*E. Credibility Determination*

1. SSR 16-3p

Jelinek next attacks the ALJ's assessment of her allegations of the intensity, persistence, and limiting effects of her pain and symptoms. In doing so, she first asserts that the ALJ "erred in assessing the credibility of [her] subjective allegations" by incorrectly evaluating her testimony pursuant to SSR 96-7p, rather than the more recent SSR 16-3p. (ECF 15 at 22). While Social Security Rulings, or SSRs, "do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999) (citation and internal quotation marks omitted). That being said, there is nothing to suggest that the ALJ identified the wrong standard to apply here. Rather, the ALJ specifically cited to SSR 16-3p (AR 49) and then laid out the same two-part test identified by Jelinek as the proper standard, (*compare* AR 49, *with* ECF 15 at 21-22). *See also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) ("The change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJs] will continue to assess the credibility of pain

26

assertions by applicants, especially as such *assertions* often cannot be either credited or rejected on the basis of medical evidence.")  Accordingly, any error at this stage occurred in the ALJ's application of SSR 16-3p rather than the application of the wrong standard.[9]

## 2.  "Boilerplate" Language

After identifying the correct standard, the ALJ opined that "[a]fter considering the evidence of the record, . . . [Jelinek's] current medically determinable impairments could reasonably be expected to produce the alleged symptoms, but . . . her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the RFC assessment."  (AR 50).  Jelinek, however, asserts that this language is "meaningless boilerplate."  (ECF 15 at 23).

As an initial matter, Jelinek is correct that the Seventh Circuit has criticized the phraseology used by the ALJ here—"to the extent that they are inconsistent with the RFC assessment"—as "meaningless boilerplate."  *Smith v. Astrue*, 467 F. App'x 507, 511 (7th Cir. 2012); *see also Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012).  The use of boilerplate language alone, though, does not necessitate remand.

> While the ALJ's boilerplate language does not match the statutory standard, an ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong.  Moreover, under SSR 16-3p . . . , the ALJ must "evaluate whether the statements are consistent with the objective medical evidence and the other evidence."  Therefore, the use of the language "not entirely consistent" is not, by itself, a basis for remand.

---

[9] Presumably, Jelinek is taking issue with the ALJ's use of the word "credible."  *See* SSR 16-3P, 2017 WL 5180304, at *2 (Oct. 25, 2017) (superseding SSR 96-7P).  Jelinek, however, cites to no case law supporting the proposition that couching an assessment of a claimant's symptom testimony in terms of credibility is a cause for remand.  *Cf. Morrison v. Saul*, 806 F. App'x 469, 474-75 (7th Cir. 2020) (using the term "credibility" when discussing an ALJ's consideration of a claimant's symptom testimony); *Green v. Saul*, 781 F. App'x 522, 526-27 (7th Cir. 2019) (same).

*Blackwell v. Berryhill*, No. 2:17-cv-00460-JVB-APR, 2019 WL 1397476, at *5 (N.D. Ind. Mar. 27, 2019) (citations omitted); *see also Joyce W. v. Berryhill*, No. 2:18-cv-104-JVB-JEM, 2019 WL 2353500, at *5 (N.D. Ind. June 3, 2019); *Torres v. Berryhill*, No. 2:17-cv-393, 2019 WL 2265367, at *6 (N.D. Ind. May 28, 2019). Accordingly, I will turn to Jelinek's arguments regarding the ALJ's alleged failure to apply the proper standard.

<u>3. Daily Activities and Medications</u>

Jelinek contends that the ALJ erred by failing to explain how he considered her daily activities and her various prescribed medications in weighing her claims regarding the intensity and persistence of her symptoms. (ECF 15 at 24-26). As to daily activities, Jelinek primarily points to her hearing testimony and adult function report where she reported that she relied on her mother for assistance in caring for her daughter, rarely left her home, had difficulty attending to personal hygiene and following written or spoken instructions, and only sometimes assisted with household chores. (*Id.* at 25).

Generally, the Court will "overturn an ALJ's adverse credibility determination only if it is unsupported by substantial evidence or rests on legally improper analysis." *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018) (citing *Ghiselli v. Colvin*, 837 F.3d 771, 778-79 (7th Cir. 2016)). An ALJ's opinion as to credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Norris v. Astrue*, 776 F. Supp. 2d 616, 632 (N.D. Ill. 2011) (citing SSR 96-7P, 1996 WL 374186, at *2 (July 2, 1996)); *see also* SSR 16-3P, 2017 WL 5180304, at *10 (superseding SSR 96-7P) ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent

28

with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

Here, Jelinek's claim that the ALJ never considered her daily activities is belied by the text of his decision. In fact, the ALJ specifically referenced Jelinek's daily activities, noting she enjoyed Facebook, selling AVON products, gardening, and considered herself "a people person." (AR 46 (citing AR 854-55)). If this limited discussion were the sole basis of the ALJ's credibility decision, though, it would likely be insufficient. *See Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time."); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("Although [the ALJ] briefly described Villano's testimony about her daily activities, he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed"); *see also Vian v. Comm'r of Soc. Sec*, 15-cv-00040-SLC, 2017 WL 461561, at *10 (N.D. Ind. Feb. 2, 2017) ("[T]he Seventh Circuit Court of Appeals has emphasized, a person who suffers from mental illness will have better days and worse days. . . . [An ALJ] must consider whether the claimant can hold a job even on low days." (citations omitted)).

The Court, however, "read[s] the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (citations omitted)). As already discussed regarding Jelinek's social interaction argument, the ALJ cited multiple instances where Jelinek's doctors' treatment notes were seemingly inconsistent with her subjective claims. (*See* AR 46-47; *see also, e.g.,* AR 882 (treatment notes from Dr. Munson showing a GAF of 70), AR 1120 (treatment notes from Dr. Munson reporting good eye contact and no agitation), AR 1150 ("The patient states that her depression has been relatively well

controlled"), AR 1160 (same)).  Further, the ALJ noted instances in which Jelinek's own
statements regarding her symptoms were inconsistent with her current claims.  More specifically,
the ALJ relied on the opinion of the initial state agency hearing officer who wrote:

> [T]he Claimant testified that her medications are beneficial. She
> stated that her knee pain has improved, as have her stamina and
> energy since her surgery. She is able to complete all required
> activities, but it does increase her pain. . . . She stated that she
> could walk around the mall and maneuver stairs. She does have
> limited patience, but does get up with her daughter in the morning
> and helps get her off to school. She is able to help with the
> household chores. She does have friends, and recently broke up
> with her boyfriend. She is able to drive and go out alone, and will
> frequently drive to help calm down when feeling upset. She can
> shop, but tries to go when there will be less people. She has
> performed some part- time work since being placed on disability,
> selling Avon and working at a local root beer stand. In addition,
> her mother testified that she moved in with the Claimant and her
> daughter, to help care for the Claimant's daughter. She stated that
> the Claimant's mood swings can lead to aggressive and violent
> behavior, and she feared for her granddaughter's safety. The
> Claimant can care for herself, cook, and clean as needed. She can
> go out alone, and shop, although mother agreed that the Claimant
> would usually go when it is less likely to be busy.

(AR 48 (quoting AR 158-59 (internal quotation marks omitted))).  While the ALJ recognized
that Jelinek and her mother also testified as to "crying spells, isolation, social avoidance,
paranoia, hallucination and delusions," their testimony was inconsistent with Dr. Munson's
treatment notes.  (AR 48).

The same findings undercut Jelinek's argument regarding the ALJ's supposed lack of
discussion of her medication.  In fact, the ALJ noted Jelinek's various medications for mental
and physical impairments throughout his decision.  (*See, e.g.,* AR 46 (citing AR 642 (October
2014 treatment note from Jelinek's bariatric surgeon noting she is "suffering from opioid
tolerance, dependence, and opioid-induced hyperalgesia" before placing her on a fentanyl patch),
AR 751 (listing Latuda, Adderall, Vibryd, Trazodone and Abilify as medication in April 2014))).

Further, as already discussed, the ALJ assigned a more restrictive physical RFC than proscribed by any other medical opinion in the record, except Dr. Gatzimos whose opinion was properly discounted.  Still more, the ALJ was entitled to rely on the opinion of Dr. Sklaroff, who reviewed Jelinek's medical record and a list of her medications (AR 82; *see also* AR 453) before concluding that "[Jelinek's] opiate and stimulant prescriptions from multiple sources do not appear closely tied to a medical etiology, and . . . there are very few signs, findings, or diagnostic test results that would correlate [to a] medical restriction of the intensity, severity and restrictiveness she asserts" (AR 42).

Accordingly, I cannot say that the ALJ's credibility determination is "patently wrong." *See Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (stating that with respect to an adverse credibility determination, it is a "rare case in which the claimant can overcome the 'considerable deference' [the court] afford[s] such findings unless they are 'patently wrong'" (citation omitted)).  "[I]nconsistent statements can provide a basis for rejecting a claimant's allegations. *Bertha M. v. Saul*, 395 F. Supp. 3d 963, 972 (N.D. Ill. 2019) (collecting cases); *see also* SSR 16-3P, 2016 WL 1119029, at *8 ("If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, we will determine that an individual's symptoms are more likely to reduce his or her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner.").  Consequently, Jelinek's challenge to the ALJ's consideration of her symptom testimony is unavailing.

## IV. CONCLUSION

In sum, because two of Jelinek's four arguments ultimately have merit and necessitate a remand of this case, I RECOMMEND that the Commissioner's decision be REVERSED and the case REMANDED to the Commissioner for further proceedings in accordance with this Report and Recommendation.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *See generally Thomas v. Arn*, 474 U.S. 140 (1985); *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 241-42 (7th Cir. 1996).

SO ORDERED.

Entered this 28th day of July 2020.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge